UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE R. PEIRCE, | ) | Case No. 3:20-cv-0248 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES G. CARR |
| vs. | ) | |
| | ) | |
| ANDREW SAUL, Commissioner | ) | MAGISTRATE JUDGE |
| of Social Security | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant. | ) | REPORT AND RECOMMENDATION |

**I.    Introduction**

Plaintiff, Michelle Peirce, seeks judicial review of the final decision of the Commissioner of Social Security, Andrew Saul, denying her application for disability insurance benefits under Title II of the Social Security Act. This matter is before me under 42 U.S.C. § 405(g), 42 U.S.C. § 1383(c)(3), and Local Rule 72.2(b). Because the ALJ followed proper procedures and her decision is supported by substantial evidence, I recommend that the Commissioner's final decision denying Peirce's application for disability insurance benefits be AFFIRMED.

**II.    Procedural History**

Peirce filed for disability insurance benefits on February 19, 2017, for a period of disability beginning on September 10, 2015. (ECF No. 10 at 57). The Ohio Division of Disability Determination initially denied Peirce's claim on May 4, 2017; it denied it again on reconsideration on August 1, 2017. (ECF No. 10 at 57). Later that month, Peirce requested a hearing before an ALJ. (ECF No. 10 at 57). ALJ Carrie Kerber presided over Peirce's hearing on October 10, 2018. (ECF No. 10 at 57). Peirce appeared with counsel and testified. (ECF No. 10 at 81-103). The ALJ issued her decision on January 16, 2019. She determined that Peirce was not disabled under the

1

Social Security Act. (ECF No. 10 at 57-69). Two weeks later, Peirce asked the Appeals Council to review and set aside the ALJ's ruling. (ECF No. 10 at 10). The Appeals Council denied Peirce's request on December 5, 2019; thus, Peirce's administrative decision was final as of that date. (ECF No. 10 at 5-12). This timely appeal followed. (ECF No. 1).

### III. Relevant Background

The ALJ's narratives of the relevant hearing testimony and submitted statements, medical evidence, and opinion evidence provide useful background in this case.

#### A. Hearing Testimony and Submitted Statements

> The claimant applied for disability benefits alleging that she has been unable to work due to bulging disk in her L3, L4, L5; left hip tear; osteoporosis; arthritis; left knee contusion and muscle failure; anxiety; depression; left neck spurs; carpal tunnel syndrome in the left wrist; and pre-diabetes (4E). It is noted at the outset, that although the claimant has been diagnosed with COPD, she did not list it as an impairment that limits her ability to work (Id.). As a result of her impairments the claimant reported that her ability to stand, walk, or sit is limited to fifteen minutes at a time (5E). The claimant reported that she is able to do dishes and assist with her fifteen month old grandson (Id.). However, she is not able to play on the floor for more than ten minutes (Id.). The claimant reported that she has difficulty lifting and carrying her grandson and estimated that he weighs approximately 25 pounds (Id.). She reported that she utilizes a cane, allegedly due to her hip, back, and knee pain (Id.). The claimant reported that she is able to drive and has no difficulty interacting with people (5E). She reported that she is able to go shopping but she will not go out alone due to a fear of falling and will need to lean on the cart for support (8F). The claimant indicated that she will spend her days watching television, going on the internet, calling friends/family, and visiting friends (8F:7). Contrary to her earlier report, the claimant testified that she is able to walk for thirty minutes (Hearing Testimony). In spite of her COPD, she testified that she continues to smoke one pack per day (Id.). The claimant testified that she has difficulty sleeping, allegedly due to pain and her mind racing (Hearing Testimony)… The claimant testified that she experiences drowsiness from her pain medication and does not like to take it before driving (Id.). However, the claimant reported that she takes her daughter to and picks her up from school on most days (Id.)… Finally, the claimant indicated that

> she would be unable to do a sit down job, allegedly because she cannot sit for eight hours and would need to constantly reposition or stand (Hearing Testimony)…

(ECF No. 10 at 62).

### B. Medical Evidence

> Imaging from July of 2014 revealed degenerative aspects most notably at L3-L5 with a broad based disc protrusion at L4-5 abutting the left LS nerve root and coexisting posterior annular tear (4E:12). Dr. Sorg diagnosed the claimant with multi-level disc disease (lF:9). Exam notes from November and December observed the claimant's spine, ribs, pelvis and back to be 'normal' (2F:7; 38). A bone density scan completed in December was normal throughout the lumbar spine but revealed some osteopenia in the claimant's neck (2F:19).
>
> In September of 2015, the claimant reportedly injured her back, knee, and hip while unloading a truck at work (3F:29). An x-ray of the pelvis revealed early degenerative changes in the sacroiliac joints and pubic symphysis (4F:56). An MRI of the left hip noted a probable cam-type femoroacetabular impingement and possible superior labrum tear extending from the one o'clock position to the two o'clock position (4F:50-5l). Following the injury, a physical examination noted some pain to palpation at the L4-S1 vertebral bodies as well as the paraspinal muscles (4F:59). The claimant was noted to have extreme difficulty with forward flexion, squatting and transitioning from the chair to the examination table (Id.). Exam records also indicate the claimant was experiencing pain with movement of the left knee and that her range of motion was limited (Id.). A subsequent MRI of the left knee was unremarkable with no evidence of a meniscus tear or injury (4F:160).
>
> From March through June of 2016, Dr. Annette Malone opined that the claimant was capable to performing sedentary work (3F:2). In April, the claimant received a steroid injection into her left hip, which allegedly 'magnified her pain everywhere else, per patient' (12F:15). An x-ray of the left hip revealed deepening of the acetabula, bilaterally and a known cam type impingement of the left hip (12F:44). Physical therapy record from that same month indicate that the claimant was 'seen for one aquatic therapy session and did not return for further therapy['] (12F:18). In June of 2016, the claimant continued to complain of pain in the left hip, which radiated down to her left foot (5F:5). At that time, the claimant rated her pain at a nine out of ten (Id.). June exam notes from Dr. John Ryan indicate that the claimant's bilateral knees and ankles had a

'pain-free [range of motion] with no effusion' (Id.). However, the claimant's lumbar spine was noted to be stiff and painful with flexion, extension, rotation, and side bending (Id.). The claimant was observed to be using a cane and walking with an antalgic gait (Id.). Later in June, the claimant underwent a left hamstring injection as well as a left sided trochanteric bursa injection, which were repeated in November (5F:6, 11, 16, 18).

In January of 2017, Dr. Ryan noted the claimant to have continued stiffness and pain in the lumbar spine with tenderness over the right sacroiliac joint and lumbar spine (6F:18). However, the claimant straight leg raise testing was negative and the claimant was ambulating without the use of a cane (Id.). Dr. Ryan opined that 'this is less of a structural problem and more of[a] complex pain syndrome/neurogenic pain' and the claimant was subsequently referred to pain management (Id.). In April of 2017, the claimant underwent a physical consultative examination (9F). At that time the claimant reported that she could sit for 30-60 minutes, stand for 30-60 minutes and walk a distance of one to two blocks (9F:7). She reported having difficulty bending and using her hands but also reported that she 'can do housework, laundry, and grocery shopping … and take care of [her]self' (Id.). Although she was noted to walk with a limp, her gait was 'otherwise steady and she did not require an assistive device' (Id.). The claimant reportedly declined to squat or walk on her heels or toes but had 'no trouble transferring onto or off of the examination table' (Id.). She was observed to have full range of motion in all joints and extremities, with some pain over multiple interphalangeal joints of the fingers, right worse than left (Id.). The claimant was able to use her hands for fine coordination and manipulative tasks such as tying knots, button buttons, holding pens, or turning doorknobs (9F:8). An x-ray of the claimant's left hip was also completed at this time, which was 'normal' (9F:9).

In November and December of 2017 and January of 2018, the claimant received bursa injections, which provided 50-60% relief (1 lF:38-49). In January, the claimant complained that her right hip felt like it was going to 'give out' (11F:51). She reported her pain was at a four out of ten with medication and an eight out often without medications and that she is taking the medications 'PRN' or on an as needed basis (11F:52). Physical examination noted improved range of motion as a result of the injections, however, the claimant complained of trochanteric bursa pain (11F:55). The claimant was continued on medications and received a steroid injection into the right trochanteric bursa as well as the erector spinea, multifidus, and serratus posterior inferior muscles (Id.). The claimant has continue to manage her pain with Percocet, Flexeril, and Naprosyn (13F:l).

4

> The claimant's pain was reported to be 'well managed' and tender point injections for myofascial pain were noted to be 'very helpful' thus not requiring a follow up for twelve weeks (13F:6)…

(ECF No. 10 at 63-64).

### C. Opinion Evidence

> The opinion of [B.T. Onamusi, M.D.,] the medical consultative examiner[,] is given some weight, as it is somewhat consistent with the record as a whole (9F). Specifically, [Onamusi] opined that the claimant is capable of sitting, standing or walking occasionally, lifting ten pounds occasionally, bending occasionally, squatting occasionally with support, and climbing steps occasionally with hand rails (9F:8). [Onamusi's] opinion is consistent with [Onamusi]'s exam findings as well as the record as a whole. More specifically, it is consistent with the claimant's antalgic but 'otherwise steady' gait that did not 'require' the use of an assistive device (9F:7). Furthermore, it is consistent with claimant's occasional use of her cane as noted at various points in the record (6F:13, 17; 8F:5). However, the undersigned finds that due to claimant's combinations of impairments, further limitations are warranted. Therefore, the residual functional capacity also limits the claimant to no climbing of ladders, ropes, or scaffolds; occasional exposure to extreme cold and vibration; and frequent balancing…

(ECF No. 10 at 66).

### IV. The ALJ's Decision

As is relevant here, the ALJ issued the following findings of fact and narrative analysis:

> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: frequent handling and fingering bilaterally; occasional climbing ramps/stairs; no climbing ladders, ropes, and scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; occasional exposure to extreme cold and vibration; the individual is capable of understanding, remembering, and carrying out simple tasks that are not fast paced [(]meaning the pace of productivity is not dictated by an external source over which she has no control[)]; and limited to a work routine that is repetitive from day to day with few and expected changes…
>
> The undersigned has carefully considered the claimant's statements

5

>concerning her impairments and their impact on the ability to perform work activity and finds the allegations are somewhat inconsistent with the other medical evidence of record. This is not to say that the claimant was symptom free, or did not experience difficulty performing some tasks. However, the record as a whole does not demonstrate the existence of limitations of such severity as to have precluded onset date of disability. While imaging studies showed some positive findings, the claimant retains normal strength and sensation, with no noted reflex changes. The record indicates that the claimant has difficulty lifting and carrying her grandson who weighs approximately twenty-five pounds… Consequently, the specified residual functional capacity is consistent with the functional limitations that can be expected from the nature and extent of the claimant's medically determinable impairments, based upon the totality of the evidence of record…

(ECF No. 10 at 61, 67).

**V.     Law and Analysis**

    **A.     Standard of Review**

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is "more than a scintilla" of relevant evidence; a reasonable person "might accept [it] as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "It is well established that the party seeking remand bears the burden of showing that a remand is proper…" *Oliver v. Sec'y of Health and Hum. Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence; if the Commissioner's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the

ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). The decisive question is whether the ALJ's conclusions are "substantially supported in the record." *Rogers*, 486 F.3d at 241. If so, then the court must affirm the Commissioner's findings, even if the court does not agree with the Commissioner's decision, or substantial evidence exists to support an alternative result. *Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."). Thus, the movant bears the burden of demonstrating that the ALJ's analysis *lacks* substantial evidence, not merely that substantial evidence supports her position, too. *See Greene ex rel. Greene v. Astrue*, No. 1:10-cv-414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010) ("[A] claimant does not establish a lack of substantial evidence by pointing to evidence … that supports her position. Rather, [a claimant] must demonstrate that there is not sufficient evidence … that would allow a reasonable mind to accept the ALJ's conclusion.").

Despite this deference, a court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards—fails to follow its own regulations—unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006). Legal error is not harmless if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* And the court will not remand a case for further administrative proceedings absent prejudice on the merits or a deprivation of substantial procedural rights. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). Similarly, if the ALJ failed to "build an accurate and

7

logical bridge between the evidence and the result," then the court cannot uphold the ALJ's decision, even one supported by substantial evidence. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). This and other 6th Circuit District Courts follow *Sarchet*'s logical-bridge requirement[1] because it ensures that a claimant will understand the ALJ's reasoning. Despite this requirement, "it is well settled that …an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make 'explicit credibility findings' as to each bit of conflicting testimony, so long as his factual findings as a whole show that he 'implicitly resolve[d]' such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006); *accord Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir.

---

[1] *E.g. Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Discussion

Peirce raises one narrow issue: Whether "[t]he ALJ's decision should be reversed because the ALJ failed to account for all of the opined limitations from Dr. Onamusi that she credited in her evaluation of his report." (ECF No. 11 at 2). Peirce attacks a sequence of sentences from the ALJ's decision. The sequence begins with the ALJ stating that she gave Onamusi's opinion only "some weight, as it is somewhat consistent with the record as a whole."[2] (ECF No. 10 at 66). The ALJ then recounts Onamusi's conclusion: "[Peirce] is capable of sitting, standing or walking occasionally, lifting ten pounds occasionally, bending occasionally, squatting occasionally with support, and climbing steps occasionally with hand rails." (ECF No. 10 at 66). And the ALJ states that Onamusi's "opinion is consistent with [Onamusi's] exam findings as well as the record as a whole." (ECF No. 10 at 66). Finally, after discussing two ways in which the opinion was consistent with the record, the ALJ stated that "due to [Peirce's] combinations of impairments, further limitations are warranted." (ECF No. 10 at 66).

Reading this sequence in isolation, Peirce argues that the ALJ's narrative signaled that she would endorse fully each of Onamusi's limitations—and limit Peirce's RFC finding further. (ECF No. 11 at 8-9). The RFC, though, listed only "occasional climbing ramps/stairs; no climbing ladders, ropes, and scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling" as postural limitations. (ECF No. 10 at 61). Thus, Peirce is correct that the RFC does not limit her to squatting or bending only occasionally, needing handrails when climbing stairs, or sitting or lifting

---

[2] Peirce does not directly challenge the weight accorded to Onamusi's opinion, and the Court does not review that decision on its own.

9

only occasionally. (ECF No. 11 at 9). Peirce contends that although "the ALJ was certainly under no obligation to adopt or outright accept any specific opinion within the record, the ALJ did have a duty to explain the reasoning behind her conclusion." (ECF No. 11 at 8). In sum, Peirce argues that the ALJ's omissions caused the case to be "unreviewable" under *Fleischer*, as the ALJ allegedly failed to construct a logical bridge between the record evidence and the conclusion. (ECF No. 11 at 8 (citing 774 F. Supp. 2d at 877)).

In response, the Commissioner notes that "the ALJ did not rely completely on [Onamusi's] opinions, nor was [the] RFC finding inconsistent with those opinions." (ECF No. 14 at 5). Concerning Onamusi's postural limitations, the Commissioner argues that "the ALJ was charged with crafting an RFC [that was] based on all of the record evidence[] and was not required to adopt Dr. Onamusi's opinions wholesale." (ECF No. 14 at 7). And concerning Onamusi's use of the word *occasionally* for Peirce's ability to sit, walk and stand, the Commissioner also argues that, while sedentary jobs "generally involve[] sitting for two thirds of a workday or more[] and walking or standing for no more than two hours in a workday, the controlling regulations state that 'jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.'" (ECF No. 14 at 8 (quoting 20 C.F.R. § 404.1567)). As the Commissioner sees it, that regulation means that "sedentary work may require sitting for one-third of the workday, standing for one-third of the workday, and walking for one-third of the workday." (ECF No. 14 at 8).

The Court concludes that the ALJ did not err in electing to not adopt some of Onamusi's limitations.

### 1. Fashioning a Claimant's RFC

During the sequential evaluation process, an ALJ must identify the claimant's RFC, which "is the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The

RFC denotes "functional limitations and restrictions and … [the claimant's] remaining capacities for work-related activities." Soc. Sec. Ruling 96-08p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The ALJ must "assess[] 'an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.'" *Stewart v. Comm'r of Soc. Sec.*, 881 F. App'x 349, 355 (6th Cir. 2020) (quoting SSR 96-8p, at *1). The ALJ must "consider [the claimant's] ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(b)(4); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).

A RFC determination is a legal finding, not a medical determination; thus, an "ALJ—not a physician—ultimately determines a claimant's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(B)); *see also Nejat*, 359 F. App'x at 578 ("Although physicians opine on a claimant's residual functional capacity to work, [the] ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); 20 C.F.R. § 404.1546(c) ("[T]he administrative law judge … is responsible for assessing your residual functional capacity."). "[E]ven where an ALJ provides great weight to an opinion, an ALJ is not necessarily required to adopt wholesale limitations contained therein." *Harris v. Comm'r of Soc. Sec.*, No. 1:13–cv–00260, 2014 WL 346287, at *11 (N.D. Ohio Jan. 30, 2014) ("[T]he regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC 'based on all of the relevant medical and other evidence" of record.'"). "Although the ALJ may not substitute his opinion for that of a physician" in fashioning an RFC, the ALJ "is not required to recite the medical opinion of a physician verbatim in his [RFC] finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(3)).

11

### 2. The ALJ's Narrative of Onamusi's Opined Limitations

As an initial point, Peirce concedes that the ALJ was not obligated "to adopt or outright accept" any of Onamusi's specific opinions. (ECF No. 11 at 8). Similarly, Peirce never objects to the ALJ according to Onamusi's opinion only "some weight." Despite this, Peirce argues that the ALJ's narrative of Onamusi's opinion creates an internal inconsistency: The ALJ "ha[s] a duty to explain the reasoning behind her conclusion," which Peirce alleges the ALJ did not fulfil concerning Onamusi's opinion of Peirce's abilities to sit, lift, squat, bend, or walk. (ECF No. 11 at 6, 8). But Onamusi is a consultative examiner. (ECF No. 10 at 64, 864-74). An ALJ is not obligated to give "good reasons" for not adopting a consultant's opinion as written. *C.f.* 20 C.F.R. § 404.1527(c)(2) (stating that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion"). Instead, the ALJ's only articulation duty is to "explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 404.1527(f)(2). Accordingly, Peirce's argument turns on whether the ALJ built a logical bridge—which must be supported by substantial evidence—between the opined limitations and the final RFC; that is, whether a subsequent reviewer can follow the ALJ's reasoning. *See generally Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-46 (6th Cir. 2004).

The Court concludes that the ALJ built a logical bridge between Onamusi's opined limitations and Peirce's RFC. The ALJ initially states that Onamusi's "opinion is consistent with [Onamusi's] exam findings as well as the record as a whole." (ECF No. 10 at 66). Then, the ALJ clarifies and specifies by stating that Onamusi's opinion is "consistent with [Peirce's] antalgic but

12

'otherwise steady' gait that did not 'require' the use of an assistive device (9F:7). Furthermore, it is consistent with [Peirce's] occasional use of her cane as noted at various points in the record (6F:13, 17; 8F5)." (ECF No. 10 at 66). In this way, the ALJ directly stated which limitations of the opinion she found to be credible. In contrast, the ALJ then stated that "further limitations are warranted" for climbing ladders, ropes, and scaffolds; exposures to extreme cold and vibration; and balancing. (ECF No. 10 at 66). (Onamusi did not directly opine on these limitations.) In this way, the ALJ explained why she gave the opinion only some weight. In doing so, she built a logical bridge between Onamusi's opinion and the ALJ's RFC, as a subsequent reviewer can understand her analysis of Onamusi's opinion and follow how it translated to the RFC.

Additionally, substantial evidence supports the ALJ's RFC finding. The ALJ found that Peirce had the residual functional capacity to

> perform sedentary work as defined in 20 CFR 404.1567(a) except: frequent handling and fingering bilaterally; occasional climbing ramps/stairs; no climbing ladders, ropes, and scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; occasional exposure to extreme cold and vibration; the individual is capable of understanding, remembering, and carrying out simple tasks that are not fast paced [(]meaning the pace of productivity is not dictated by an external source over which she has no control[)]; and limited to a work routine that is repetitive from day to day with few and expected changes…

(ECF No. 10 at 61).

Peirce argues that the ALJ should have adopted Onamusi's bending and squatting limitation. (ECF No. 11 at 8). The ALJ's narrative explains that Peirce was "noted to have extreme difficulty with forward flexion, squatting and transitioning from the chair to the examination table" during a 2015 examination. (ECF No. 10 at 63). In 2016, Peirce's "lumbar spine was noted to be stiff and painful with flexion, extension, rotation, and side bending." (ECF No. 10 at 63). But in 2017, Peirce was ambulating without using a cane. (ECF No. 10 at 63-64). After Onamusi's

13

examination, Peirce received steroid injections, which provided "'moderate improvement.'" (ECF No. 10 at 64 (quoting ECF No. 10 at 983)). A few months later, doctors remarked that Peirce "was noted to be in no distress, to have full range of motion, and there was no mention of a limp or the use of a cane"; what's more, Peirce was not taking pain pills at the time. (ECF No. 10 at 64). These facts show positive progression in Peirce's ability to bend and squat. Indeed, her ability to climb on and off of Onamusi's exam table shows notable improvement from past doctors' visits. Moreover, Peirce refused to squat during her consultation with Onamusi. Together, these facts cast some doubt on the reliability of Onamusi's opinion that Peirce could squat or bend only occasionally. Thus, substantial evidence supports the ALJ's decision to omit Onamusi's limitations for squatting and bending.

Peirce also argues that the ALJ should have adopted Onamusi's limitation to only occasional climbing of stairs with handrails. (ECF No. 11 at 8). Instead, the ALJ limited Peirce to "frequent balancing." (ECF No. 10 at 61, 66). In support, the ALJ noted that Peirce stated that she "does not go out alone due to a fear of falling and will need to lean on the cart for support. (ECF No. 10 at 62). But the ALJ also noted that Peirce no did not appear to need a cane on multiple occasions. (ECF No. 63-64). Moreover, Peirce did not appear to need any assistance—either for pain or for balance—when getting onto or off of Onamusi's exam table or walking. (ECF No. 10 at 870 ("[Peirce] did not require any assistive device for ambulation or transfer.")) Thus, there is little basis for Onamusi's opinion that Peirce could climb stairs with handrails only occasionally. (ECF No. 10 at 870). Accordingly, substantial evidence supports the ALJ adopting a less severe balancing limitation.

Peirce also argues that the ALJ should have adopted Onamusi's limitation to only occasional lifting of ten pounds or less. (ECF No. 11 at 8). The ALJ restricted Peirce to sedentary

14

work. Social Security Ruling 83-10p explains that "[t]he regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." Onamusi's opinion states that Peirce can lift up to ten pounds occasionally. (ECF No. 10 at 870). Although the ALJ did not issue an additional lifting limitation, the implication of a sedentary-work finding is that Peirce would be asked to lift no more than 10 pounds at a time—and to do so only occasionally. SSR 83-10p. Accordingly, the Court concludes that the ALJ did adopt Onamusi's 10-pound lifting limitation, as it is inherent in the definition of sedentary work.

Peirce also argues that the ALJ should have adopted Onamusi's limitation to only occasional sitting. (ECF No. 11 at 8). But Peirce has not demonstrated that she cannot perform the sitting requirement of sedentary work, *i.e.*, that she cannot sit for "approximately 6 hours of an 8-hour workday" with expected "walking … [of] generally … no more than about 2 hours of an 8-hour workday." SSR 83-10. Indeed, SSR 83-10 notes that a sedentary worker often undertakes "a certain amount of walking and standing … in carrying out [sedentary] job duties." Moreover, it implies that walking and standing (and, thus, repositioning) are relatively frequent and circumstance-flexible, as "[w]ork processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles." SSR 83-10. As the claimant, Peirce must demonstrate that she requires sitting and repositioning limitations above what sedentary work already provides. 20 C.F.R. § 404.1512(a).

As the ALJ noted, Peirce stated during the hearing that "she would be unable to do a sit down job, allegedly because she cannot sit for eight hours and would need to constantly reposition or stand." (ECF No. 10 at 62 (citing ECF No. 10 at 101)). Additionally, Peirce now contends that she could sit for only "two and two-third hours in an eight-hour workday." (ECF No. 11 at 9-10).

15

Onamusi opined that Peirce "can sit for 30-60 minutes" at a time, and his opinion did not opine on how long Peirce would need between periods of sitting for 30-60-minutes. (ECF No. 10 at 870). The RFC accounts for Onamusi's 30-60-minute limitation, as a sedentary-work finding could allow Peirce to stand, walk, and reposition during the other two hours of an eight-hour workday. Peirce has failed to demonstrate that she requires any additional limitations.

Instead, substantial evidence supports the ALJ's finding that Peirce can meet the sitting requirements of sedentary work. For example, the ALJ noted that Peirce stated during her 2017 evaluation that "she … spend[s] her days watching television, going on the internet, calling friends/family, and visiting friends." (ECF No. 10 at 62 (citing ECF No. 10 at Ex. 8F)). Peirce also stated that she was able to drive. (ECF No. 10 at 62 (citing ECF No. 10 at Ex. 5E)). These are largely sedentary activities. And concerning the ALJ's analysis of Peirce's subjective statements of pain and discomfort (which Peirce does not challenge here), the ALJ concluded that her "allegations are somewhat inconsistent with the other medical evidence of record." (ECF No. 10 at 67). An ALJ, as the one who presides over the administrative hearing, is in the best position to judge a claimant's subjective statements. *Jones*, 336 F.3d 475-76. In sum, substantial evidence supports a finding that Peirce is able to perform the sitting requirements of sedentary work despite her belief that she would not succeed in such a role.

There may be substantial evidence to support the limitations in Onamusi's opinion that the ALJ rejected. But "the ALJ is not required to recite the medical opinion of a physician verbatim in his [RFC] finding," and the RFC finding is ultimately the ALJ's province. *Poe*, 342 F. App'x at 157 (citing 20 C.F.R. § 404.1545(a)(3)). Moreover, the ALJ enjoys a zone of choice within which to find the facts without a court second guessing him. *Mullen*, 800 F.2d at 545. The ALJ's RFC findings are supported by substantial evidence. Accordingly, they should not be disturbed.

\*          \*          \*

Because the ALJ explained the weight given to Onamusi's opinion and the limitations listed therein by building a logical bridge between Onamusi's opinion and the limitations the ALJ included in the RFC, and because the RFC is supported by substantial evidence, the Court concludes that there is no error.

## VI.  Recommendation

Because the ALJ followed proper procedures and her decision is supported by substantial evidence, I recommend that the Commissioner's final decision denying Peirce's application for disability insurance benefits be AFFIRMED.

DATED: 1/25/2021

*Carmen Henderson*

Carmen E. Henderson
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); see also *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).